UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD KOELLER and KEVIN CHEEK, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>NUMRICH GUN PARTS CORPORATION,<br><br>     Defendant. | Case No. 1:22-cv-00675-DNH-CFH |

**MEMORANDUM SUPPORTING PLAINTIFFS' MOTION FOR FINAL APPROVAL**

## INTRODUCTION

The Court should approve the parties' settlement under Rule 23. Since the Court preliminarily approved the settlement in December 2023 as "fair, adequate, and reasonable," the notice and claims program has only proved that point. The settlement administrator notified the class through mail and website notices, reaching 45,041 class members— 99.3% of the class. In response, the class welcomed the settlement. Over 3,300 class members claimed benefits, equaling a 7% claims rate. That rate tops those rates found in other data breach cases across the country, speaking to its "reasonableness." Indeed, 3,201 class members chose the $50 cash payment, a popular but atypical benefit for class members in data breach cases. This is not to mention that no class members objected and only three opted out. In other words, the claims activity meets or exceeds the standards required to approve the settlement. And given the benefits it will provide, the Court should approve the settlement under Rule 23 so the parties may deliver them to the class.

As background, this is a payment card data ("PCD") breach affecting around 45,000 Numrich customers. In January 2022, cybercriminals exploited a vulnerability in Numrich's systems allowing them to steal customer PCD. That included customer names, card numbers, expiration dates, and security codes—all the data needed to steal identities and commit fraud. Once Numrich discovered the breach in March 2022, plaintiffs allege Numrich did not take its systems offline, instead letting the breach persist for another week before eliminating the vulnerability. In other words, the criminals had access to customer PCD for two months before the breach stopped.

This fact pattern posed risks for both sides. On liability, plaintiffs believe they would have proved Numrich had not met its duties to safeguard customer data under tort, contract, and statutory principles. On the other hand, Numrich disputed the class could prove losses from the breach, including whether they suffered fraud and spent resources remediating or mitigating it.

Although plaintiffs prevailed on that issue when resisting Numrich's motion to dismiss, the Court noted plaintiffs' losses noted were "thin."

Recognizing those risks and the risks that come with litigating data breach class actions, the parties explored grounds for a settlement. In so doing, plaintiffs conditioned their participation on receiving pre-mediation discovery that would allow them to investigate the landscape affecting settlement. Numrich consented, and the parties agreed to mediate with Attorney Ben Picker, who brokered a framework for settling, one the parties refined to produce the Settlement Agreement.

In December 2023, The Court preliminarily approved the settlement as "fair, adequate, and reasonable," finding it "will likely be able to approve the proposed Settlement[.]" And given that the parties' notice program contacted 45,077 class members, with 7% claiming benefits and none objecting, plaintiffs have reinforced the Court's findings.

If approved, the settlement will deliver five benefits to the class. First, it guarantees claimants credit monitoring for three years at no cost with $1 million in fraud insurance. Over 1,500 class members have claimed this benefit. Second, class members can receive a $50 cash payment without proving any losses from the breach. Around 3,200 members have claimed this benefit. Third, if class members suffered losses following the breach, they can receive up to $500 in expenses, up to $100 for lost time, and up to $5,000 for "extraordinary" losses—if they did not elect the $50 payment. Altogether, 113 class members elected these benefits. Fourth, Numrich has affirmed it improved its cybersecurity following its breach. And fifth, defendant will pay the costs to administer the settlement, the class's attorney fees and costs, and plaintiffs' service awards—all without reducing the benefits to the class. All class members will benefit from this relief.

As a result, the Court should certify the class and approve the settlement under Rule 23 so the parties may deliver these benefits.

## BACKGROUND

**a. Numrich's data breach and Plaintiffs' claims**

Numrich is a "well-known firearm parts and weapons retailer" based in Kingston, New York. Doc. 25 ("Compl.") ¶ 1; Doc. 31, p. 3. To run its business, Numrich collects PCD from its customers. Doc. 31, p. 3. That information includes a customer's "name, address, payment card number, card security code, and expiration date." *Id*. In so doing, Numrich promises to protect patients' data through its privacy policy, committing to use "reasonable measures" to safeguard customers' PCD from theft and misuse. Id. Indeed, customers rely on Numrich's promise when buying products from the company. Compl. ¶ 37. Even so, Plaintiffs allege that Numrich never implemented the safeguards and systems needed to fulfill those promises. *Id*. ¶ 39. As a result, plaintiff alleges that Numrich's misconduct led to a data breach. *Id*. ¶ 40.

In March 2022, Numrich discovered that criminals had bypassed its security systems and compromised customer PCD. Doc. 31, p. 3. Numrich did not detect the hack before it happened; indeed, it had been carrying on since January 2022 through a vulnerability on Numrich's website. *Id*; Compl. ¶ 40. As a result, Numrich's breach exposed the PCD belonging to over 45,000 customers, including Plaintiffs. *Id*. ¶ 44.

Plaintiffs are Numrich customers and breach victims. Doc. 31, p. 4. In June 2022, Plaintiffs sued Numrich to remediate the harm its breach had caused them and the class, asserting four counts and demanding that Numrich reimburse the class's losses and improve its security. Compl. Prayer for Relief. In response, Numrich twice moved to dismiss, denying liability for any harm its breach caused. Docs. 30 and 12.

b.  **Procedural history & discovery**

Plaintiffs resisted Numrich's motions to dismiss, responding that they had alleged standing, damages, and their claims under New York law. Doc. 27. In May 2023, the Court ruled on Numrich's motion, finding that Plaintiffs had standing and stated claims under tort and contract principles. Doc. 31. But the Court dismissed Plaintiffs' statutory claim under General Business Law § 349 for failing to show a "nexus" between Numrich's misconduct and New York state. *Id*. p. 19. On damages, the Court found that Plaintiffs had "sufficient[ly]" alleged them, but noted they were "thin:" "plaintiffs' [damages] allegations are thin, and discovery may well reveal that plaintiffs did not suffer any actual or ascertainable damages." *Id*. p. 15.

In June 2023, Numrich answered Plaintiffs' complaint, denying liability on all claims. Compl. ¶ 32. Given the risks confronting Numrich on its liability, and those confronting Plaintiffs on their damages, the parties agreed to explore mediating the matter. Doc. 37-2 ¶ 7. But Plaintiffs' counsel conditioned mediation on receiving "pre-mediation" discovery on Numrich's breach, information that would allow them to evaluate Plaintiffs' claims. *Id*. Numrich consented and disclosed information on the class's size, the data impacted, how the breach unfolded, how Numrich responded, and what it did to eliminate the vulnerabilities in its systems. This information allowed Plaintiffs' counsel to understand all aspects affecting any settlement with Numrich. *Id*.

Armed with this information, Plaintiffs agreed to mediate the case with Ben Picker, a mediator experienced in settling data breaches on terms that Courts routinely approve. *Id*. ¶ 8.

c.  **Mediation & preliminary approval**

In August 2023, the parties attended a full day mediation with Bennett Picker, Esq. of Stradley Ronon, a respected mediator in the data breach and class action space. Doc. 37-2 at ¶ 9. At mediation, the parties negotiated at "arm's length," communicating their positions through

4

Attorney Picker, evaluating the strengths and weaknesses underlying their claims and defenses. *Id*. From the start, the parties agreed they would not negotiate the proposed class's attorney fees or plaintiffs' service awards until they agreed on the settlement agreement's core terms, thus avoiding conflict between plaintiffs, their counsel, and the class. *Id*.

Although the parties did not settle at mediation, they developed a framework for settlement that they refined over the next two months. *Id*. ¶ 10. Those efforts paid off. The parties agreed on the terms for settlement that secure the benefits plaintiffs wanted when they started this case.

In December 2023, the Court "preliminarily" approved the parties' settlement as "fair, adequate, and reasonable." Doc. 38. In so doing, it found that plaintiffs "will likely be able to certify the Settlement Class for purposes of judgment on the Settlement because it meets all of the requirements of Rule 23(a) and the requirements of Rule 23(b)(3)[.]" *Id*. ¶ 7. Also finding Plaintiffs and their counsel "adequate," the Court appointed them to represent the class and ordered them to notify it about the settlement's terms, including the request for $335,000 in proposed attorney fees and $3,000 for service awards. *Id*. ¶¶ 15-16. Last, it appointed the Angeion Group as the settlement administrator, ordering Angeion and the parties to notify the class about settlement. *Id*. ¶ 14.

d. **Notice program & claims activity**

Two days after the Court preliminarily approved the settlement, Numrich provided 45,169 records with class members' names and "last known mailing address[es]." Angeion Dec. ¶ 5. Angeion then "deduped" those addresses to remove duplicates, resulting in "45,044 unique Class Members" with addresses. *Id*. But before notifying the class with those records, Angeion also processed them through USPS's "National Change of Address" database. *Id*. ¶ 6. That allowed Angeion to update the contact information for 2,766 members. *Id*. And with that list, Angeion notified the class with the postcard notice approved by the Court. *Id*. ¶ 7, Ex. B. USPS returned

5

only 306 as "undeliverable *with* a forwarding address" and 949 without. *Id*. ¶¶ 8-9 (emphasis added). Still, skip tracing those members yielded another 643 addresses to re-mail notice to. *Id*. ¶ 9.

In total, Angeion mailed 45,077 notices with only 296 remaining "ultimately undeliverable." *Id*. ¶ 10. That means Angeion reached 99.3% of the class. *Id*. Once notified, class members started accessing the website set up by Angeion for class members at www.NGPClassActionSettlement.com. *Id*. ¶ 11. The site hosted all documents at issue in this settlement and allowed class members to claim benefits through an online portal. *Id*. Through May 13, 2024, 3,372 "unique visitors" visited the website, with 9,314 page views. *Id*. Last, Angeion hosted a toll-free hotline dedicated to answering questions about the settlement and updating contact information for class members if needed. *Id*. ¶ 13. That service received 334 calls. *Id*. ¶ 14.

In other words, Angeion exhausted all "reasonable" means to contact class members about the settlement and succeeded in doing so. This is reflected in the claims activity following notice. The deadline to claim benefits was May 2, 2024, and Angeion received 3,312 claims by that deadline. *Id*. ¶ 15. As Angeion explains "3,201 Claim Forms were submitted for the alternative cash payment option, 9 for out-of-pocket costs, 104 for lost time related to data breach and 1,526 for credit monitoring services." *Id*. ¶ 15.

**ARGUMENT**

a. **The Court should approve the settlement under Rule 23 and the *Grinnell* factors**

Courts encourage parties to settle class actions given their potential for costs, delays, complexity, and risks: "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation. There

6

is a strong public interest in quieting any litigation; this is 'particularly true in class actions.'" *In re Luxottica Group S.p.A. Sec. Litig.* (In re Luxottica Group Litig.), 233 F.R.D. 306, 310 (E.D.N.Y. 2006). See also *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 157 (E.D.N.Y 2009) ("There is a strong judicial policy in favor of settlement, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy."). And this is not only a "complex" case—"it lies within an especially risky field of litigation: data breach." *Id*. This is why courts favor settling breach cases, as "proceeding through the litigation process[…] is unlikely to produce the plaintiffs' desired results." *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 U.S. Dist. LEXIS 87409, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010).

Courts approve settlements under these principles in two steps. First, the "preliminary stage," that the parties completed under this approval order. *Chang v. Philips Bryant Park LLC*, No. 17 Civ. 8816 (LTS) (SLC), 2019 U.S. Dist. LEXIS 185297, 2019 WL 8105999, at *7 (S.D.N.Y. Oct. 23, 2019). Second, after the parties notify the class, the Court must decide whether to "finally" approve the settlement under precedent and Rule 23.

The Second Circuit has developed factors governing whether to approve settlements, and this settlement meets them. Those factors are: (i) the case's complexity and "likely duration;" (ii) how the class has reacted to settlement; (iii) the case's litigation stage; (iv) the case's risks in proving liability; (v) the risks in proving damages; (vi) the risks in maintaining a case through trial; (vii) defendant's ability to pay a "greater judgment;" (viii) the "range of reasonableness" for the case. *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 88 (S.D.N.Y. June 10, 2009) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Altogether, those factors determine whether the settlement results from "serious, informed, non-collusive ('arm's length')

7

negotiations, where there are no grounds to doubt its fairness and no other obvious deficiencies[.]" *See Cohen*, 262 F.R.D. at 157.

Rule 23 lists its own criteria for approving settlements, but factors that do not supplant the *Grinnell* factors. *Soler v. Fresh Direct, LLC*, 2023 U.S. Dist. LEXIS 42647, at *8 (S.D.N.Y. Mar. 14, 2023) ("This [Rule 23] inquiry overlaps with the Grinnell factors"). Instead, Rule 23's criteria focuses "the court and the lawyers on the core concerns of procedure and substance" under four factors: (i) "adequacy of representation;" (ii) whether there were "arm's length" negotiations; (iii) "adequacy of relief;" and (iv) equity between class members. *Id*; *See* Rule 23(e). Within the third factor, "adequacy of relief," the Court considers the case's risks, how the parties propose distributing relief, attorney's fees terms, and any other agreements impacting settlement. *Id*.

Because the *Grinnell* and Rule 23(e) factors "overlap," plaintiffs condense their analysis below to reflect that principle. *Soler*, 2023 U.S. Dist. LEXIS 42647, at *8 (applying a condensed analysis); *In re Hudson's Bay Co. Data Sec. Incident Consumer Litig.*, No. 18-cv-8472 (PKC), 2022 U.S. Dist. LEXIS 102805, at *28 (S.D.N.Y. June 8, 2022) (same).

    i.    <u>Plaintiffs and counsel represented the class "adequately"</u>

The settlement satisfies Rule 23(e)(2)(A) because plaintiffs and their counsel represented the class "adequately" when negotiating it. Meeting this factor entails determining whether Plaintiffs' interests are "antagonistic" to class members' interests and whether Plaintiffs' counsel is qualified and experienced in the litigation. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). Plaintiffs have satisfied this inquiry.

There is no antagonism between plaintiffs, their counsel, and the class because plaintiffs are accepting the same relief on the same terms as all other class members. Although they will

8

request service awards, those awards are not guaranteed, and the class will receive the settlement's benefits no matter how the Court rules on plaintiffs' requests. To achieve those benefits, plaintiffs helped their attorneys investigate the breach, supplied the facts supporting three complaints, remained engaged through the litigation process, and responded to their attorneys' inquiries. Doc. 37-2 ¶ 12. What's more, plaintiffs and their counsel withheld negotiating attorney fees and awards until after the parties agreed on the settlement's core terms, thus removing any conflict that may result from concurrent negotiation. *Id.* ¶ 11.

Plaintiffs' counsel also has the experience needed to represent the class and secure relief. *Id.* "Counsel's Qualifications." Counsel has represented data breach victims across the country and reached settlements that courts routinely approve. And that experience served plaintiffs and the class considering the results achieved in the settlement.

As a result, the Court should find plaintiffs have satisfied this factor.

    ii.    <u>The Court should presume the Settlement is "approvable"</u>

To achieve the "fairness" that Rule 23(e)(2)(B) demands, plaintiffs must show their proposal was negotiated at "arm's length." That exists if plaintiffs reached their agreement "experienced, capable counsel knowledgeable in complex class litigation" and through a "mediator's involvement[.]" *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019). In fact, if the parties satisfy this factor, "the Settlement will enjoy a presumption of fairness." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000). That presumption applies here.

As detailed above, plaintiffs' counsel litigates privacy cases like data breaches in state and federal actions, meaning they understand how this settlement compares to other data breach settlements. *Id.* "Counsel's Qualifications." Indeed, counsel knew the terms to advocate for and

9

how to adjust them to this case, one that involves PCD rather than other PII like Social Security numbers. *Id*. ¶ 11. In so doing, counsel emphasized the relief that a PCD breach victim would benefit from, including credit monitoring and cash reimbursements. *Id*. They negotiated those terms with a mediator, Attorney Picker, who also has experience settling data breach class actions that courts approve. *Id*; *id*. ¶ 9.

Although the parties settled this matter before formal discovery started, that is no bar to approving their agreement's terms as plaintiffs' counsel insisted on pre-mediation discovery. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2007) ("although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information"); *Castagna v. Madison Square Garden, L.P.*, No. 09-cv- 10211 (LTS)(HP), 2011 U.S. Dist. LEXIS 64218, 2011 WL 2208614, *6 (S.D.N.Y. June 7, 2011) (counsel had "completed enough investigation to agree on a reasonable settlement" even without discovery). Indeed, the "pertinent question" is not whether plaintiffs conducted Rule 26 discovery, but "whether counsel had an adequate appreciation of the merits of the case before negotiating" *Willix v. Healthfirst, Inc.*, No. 07–cv–1143, 2011 WL 754862, at *4 (E.D.N.Y. Feb. 18, 2011). Because plaintiffs gathered the facts they needed before mediating, they understood the landscape affecting settlement just as if they had conducted discovery.

For these reasons, the court should find plaintiffs have satisfied this factor and the third *Grinnell* factor.

    iii.   <u>The Settlement's relief is "adequate" considering this case's complexity and risks and the relief this settlement achieves</u> [1]

Without settling, this case faced risks that would have delayed or doomed plaintiffs' chances at recovery. Almost "all class actions involve a high level of risk, expense, and

---

[1] There are no other agreements plaintiffs would otherwise need to disclose under Rule 23(e)(3).

10

complexity[.]" *Desue v. 20/20 Eye Care Network, Inc.*, No. 21-CIV-61275-RAR, 2023 U.S. Dist. LEXIS 117355, at *24 (S.D. Fla. July 8, 2023). And this is not only a "complex" case—"it lies within an especially risky field of litigation: data breach." *Id*. This is why courts favor settling breach cases, as "proceeding through the litigation process[…] is unlikely to produce the plaintiffs' desired results." *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 U.S. Dist. LEXIS 87409, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010); *See, e.g., In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-md-2807, 2019 U.S. Dist. LEXIS 135573, at *13 (N.D. Ohio Aug. 12, 2019) ("[D]ata breach litigation is complex and largely undeveloped."); *Fulton-Green v. Accolade, Inc.*, 2019 U.S. Dist. LEXIS 164375, at *21 (E.D. Pa. Sep. 23, 2019) ("This is a complex case in a risky field of litigation because data breach class actions are uncertain and class certification is rare.").

To start, data breach cases do not always clear the motion-to-dismiss stage. *See, e.g., Hammond v. The Bank of N.Y. Mellon Corp., No. 08 Civ. 6060 (RMB)(RLE)*, 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting dismissed data breach cases at the Rule 12(b)(6) stage). And when they do, Courts will still sometimes dismiss them at summary judgment or refuse to certify them. *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 397 (D. Mass. 2007) (refusing to certify data breach class action); *Stollenwerk v. TriWest Healthcare All.*, No. CV–03–0185–PHX–SRB, Slip Op. at 5–6 (D. Ariz. June 10, 2008) (same); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013) (same). Although plaintiffs believe they would have overcome these hurdles given the facts in issue, they presented risks that justified settling at the stage plaintiffs did.

More to the point, the Court identified a risk that bears on *Grinnell* factor five: the risks in proving damages. As stated above, the Court accepted plaintiffs' damages pleadings, but noted

11

they were "thin" and may not survive discovery. Plaintiffs understand that risk given that this is a PCD case—one that does not have the enduring harms presented in a breach that exposes Social Security numbers. Courts dismiss some PCD cases for that reason, as they do not threaten consumers like an SSN or medical data breach do. *See Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89, 90 (2d Cir. 2017).

To justify taking this case to trial, plaintiffs would need to clear these hurdles and achieve a better result when there are no grounds to believe trial would yield one. The Court and parties cannot estimate the upside in litigating this case through to trial because breach victims have yet to try a case, so there is no verdict to measure their result against. There is no evidence Numrich could "withstand a greater judgment," and would that factor defeat settlement if it could.[2] Nor is this case the right candidate for trial given the relief the Agreement delivers. Again, the Agreement achieves what plaintiffs wanted in their complaint—compensation for the classes losses and for Numrich to improve its security. There is no reason to risk losing recovery entirely by refusing to settle on those terms.

Last, plaintiffs petitioned the Court to approve their attorney fee and award requests, both falling within what district courts approve. Doc. 40; *See Hart v. BHH, LLC*, No. 15cv4804, 2020 U.S. Dist. LEXIS 173634, at *30 (S.D.N.Y. Sep. 22, 2020) (in a claims based class settlement, awarding 51.75% of the total benefit to the class as attorneys' fees); *In re Telik*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("[i]n contingent litigation, lodestar multiples of over 4 are routinely awarded by courts") (citation omitted); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481-83 (S.D.N.Y. 2013) (granting an award of $5,000 to $7,500 to Plaintiffs); *Dornberger v. Metropolitan*

---

[2] *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178 n.9 ("ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair.").

*Life Ins.*, 203 F.R.D. 118 (S.D.N.Y. 2001) (noting in class actions representative plaintiff awards from $2,500 to $85,000 are commonly accepted).

As a result, the Court should find this factor supports approval under this factor and the first, fourth, fifth, and sixth *Grinnell* factors.

      iv.   <u>The settlement treats class members equitably and is within the "range of reasonableness"</u>

The results the Agreement secures exceeds those won in other data breach settlements. Indeed, this settlement differs from those only in that it provides class members an "alternative cash payment" that they could claim without needing to prove a claim. *See, In re Hudson's Bay Co. Data Sec. Incident Consumer Litig.*, No. 18-cv-8472 (PKC), 2022 U.S. Dist. LEXIS 102805, at *29-30 (S.D.N.Y. June 8, 2022) ("Comparable data-breach cases have provided lower settlement payments to class members, with relief that includes a payment of $10 or merchant coupons"); *In re Canon United States Data Breach Litig.*, No. 20-CV-6239-AMD-SJB, 2023 U.S. Dist. LEXIS 206513, at *14 (E.D.N.Y. Nov. 15, 2023) (reimbursing out-of-pocket losses and offering credit monitoring, but no cash payments); *Brady v. Due N. Holdings, LLC*, No. 17-cv-1313, Doc. No. 59, at 4 & Doc. No. 65, at 2 (S.D. Ind. Oct. 16, 2018) (same); *Torretto v. Donnelley Fin. Sols., Inc.*, No. 1:20-cv-02667-GHW, 2023 U.S. Dist. LEXIS 5440, at *5 (S.D.N.Y. Jan. 5, 2023) (same); *Reynolds v. Marymount Manhattan Coll.*, No. 1:22-CV-06846-LGS, 2023 U.S. Dist. LEXIS 191993, at *6 (S.D.N.Y. Oct. 23, 2023) (same). And given that benefit's popularity here, plaintiffs have established *why* they negotiated to include it. This is not to mention that those class members could *also* claim credit monitoring, as 1,526 did here. Angeion Dec. ¶ 15.

On equity, Rule 23 considers "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ.

13

P. 23 advisory committee's note to 2018 amendment. In other words, the purpose is "equity," not "equality" in treatment. This settlement advances equity because it allowed claimants to claim "actual" losses from the breach, whether that be time or "out-of-pocket" costs. Nine claimants elected out-of-pocket costs and 104 chose time, ensuring the settlement accounted for the differences among the class's claims.

     v.    <u>The class's reaction to the settlement</u>

It is "well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002); *Grinnell*, 495 F.2d at 462-63. That said, "[a] certain number of objections are to be expected in a class action like this one with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 511 (E.D.N.Y. 2003). A "small" number includes numbers like 18 out of 27,883 class members. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (holding that "[t]he District Court properly concluded that this small number of objections [18 where 27,883 notices were sent] weighed in favor of the settlement").

As explained below, the 7% claims rate tops those found in other data breach settlements, speaking to its popularity with the class. Indeed, no class members objected to the settlement and only three opted out, meaning there is no evidence the class disapproves of it in any way. As a result, "the reaction of the class to the settlement also weighs in favor of final approval of the Settlement Agreement." *In re Nano-X Sec. Litig.*, No. 21-CV-5517 (RPK) (PK), 2024 U.S. Dist. LEXIS 71340, at *10 (E.D.N.Y. Apr. 17, 2024).

### b. The Court should certify the class

Certifying a class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants." *Meredith*, 87 F. Supp. 3d at 658 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995)). The Court certified the class in its preliminary approval order and the reasons justifying the order have not changed. *See* Doc. 38. For that reason, the Court can rely on its order without analyzing Rule 23's factors again. *See Treasury Spoofing* at 26 (adopting the arguments made in support of settlement "best outlined in plaintiffs' memorandum in support of preliminary approval" and where "no changes in the case that would warrant deviating from my initial view"); *see also In re Bear Stearns Cos., Inc. Sec., Derivative and ERISA Litig.*, 909 F. Supp. 2d 259, 264 (S.D.N.Y. 2012) (finally approving settlement where there "have been no material changes to alter the proprietary of [the court's] findings" at the preliminary approval stage).

For completeness, the Court certified the class for four reasons. First, it found the class was "numerous" because "joinder of all Settlement Class Members would be impracticable[.]" Doc. 38; Rule 23(a). With over 45,000 class members, that fact supporting that finding has not changed. Second, the claims program shows plaintiffs have established their "adequacy," as they contacted 99.3% of the class with a 7% claims rate and no objections. Third, typicality and commonality remain the same, as the same issues that affect plaintiffs affect the class, and those issues have not changed. And fourth, all issues impacting the class predominate over any "individualized" issues. Any differences between class members did not impact the analysis here, as only three opted out and none objected. As a result, the Court should apply the same analysis it applied in its preliminary approval order to certify the class under Rule 23.

15

    **c. The Court should approve the notice program**

The Court should approve the notice program because it succeeded. Class members are entitled to the "best notice that is practicable under the circumstances" of any proposed settlement before it is finally approved by the Court. *Id*. "The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." *Id*. To comply with due process, notice must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997). Notice must explain: (i) the action; (ii) how the class is defined; (iii) the class claims, issues, or defenses; (iv) that a class member appear through an attorney; (v) that the court will exclude from the class any member who requests it; (vi) the time and manner for requesting exclusion; and (vii) the binding effect that class judgment has on members. Fed. R. Civ. P. 23(c)(2)(B).

Plaintiffs have met that standard. In total, Angeion mailed 45,077 notices with only 296 remaining "ultimately undeliverable." Angeion Dec. ¶ 10. That means Angeion reached 99.3% of the class. *Id*. Once notified, class members started accessing the website set up by Angeion for class members at www.NGPClassActionSettlement.com and calling Angeion at the hotline it hosted to provide information on the settlement. *Id*. ¶ 11. The deadline to claim benefits was May 2, 2024, and Angeion received 3,312 claims by that deadline. *Id*. ¶ 15. As Angeion explains "3,201 Claim Forms were submitted for the alternative cash payment option, 9 for out-of-pocket costs, 104 for lost time related to data breach and 1,526 for credit monitoring services." *Id*. ¶ 15.

The 7% claims rate achieved here stands out in context. District courts approve class action settlements with claims rates between one to five percent. *See Munday v. Navy Fed. Credit Union*, 2016 U.S. Dist. LEXIS 193973, 2016 WL 7655807, at *8 n.1 (C.D. Cal. Sept. 15, 2016) (quoting

16

*Forcellati v. Hyland's, Inc.*, 2014 U.S. Dist. LEXIS 50600, 2014 WL 1410264, at *6 (C.D. Cal. Apr. 9, 2014)) ("The prevailing rule of thumb with respect to consumer class actions is [a claims rate of] 3-5 percent."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc) (observing that claims rate in consumer class action settlements "rarely exceed seven percent, even with the most extensive notice campaigns"). Indeed, the Sixth Circuit and other federal appellate and district courts have approved settlements with claims rates of 3% or lower. *See, e.g., In re Packaged Ice Antitrust Litig.*, No. 17-2137, 2018 U.S. App. LEXIS 13882, 2018 WL 4520931, at *5 (6th Cir. May 24, 2018) (approved a one percent response rate); *Keil v. Lopez*, 862 F.3d 685, 696-97 (8th Cir. 2017) (observing that "a claim rate as low as 3 percent is hardly unusual in consumer class actions"); *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 214-15 (W.D. Mo. 2017) (collecting cases "where the claims rate was less than one percent").

As a result, the notice program here satisfies due process. It was the "best notice that [was] practicable under the circumstances" and succeeded at what it aimed to do. Rule 23(c).

## CONCLUSION

For the reasons above, the Court should approve the parties' settlement and certify the class.

Dated: May 16, 2024          By: */s/ Raina C. Borrelli*
                                            Raina C. Borrelli
                                            Alex Phillips
                                            STRAUSS BORRELLI PLLC
                                            One Magnificent Mile
                                            980 N Michigan Avenue, Suite 1610
                                            Chicago IL, 60611
                                            Telephone: (872) 263-1110
                                            raina@straussborrelli.com
                                            aphillips@straussborrelli.com

                                            James J. Bilsborrow (NY Bar # 519903)
                                            WEITZ & LUXENBERG, PC
                                            700 Broadway

          New York, NY  10003
          Telephone: (212) 558-5500
          jbilsborrow@weitzlux.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Raina C. Borrelli, hereby certify that on May 16, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, below, via the ECF system.

DATED this 16th day of May, 2024.

        STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*
    Raina C. Borrelli
    raina@straussborrelli.com
    STRAUSS BORRELLI PLLC
    One Magnificent Mile
    980 N Michigan Avenue, Suite 1610
    Chicago IL, 60611
    Telephone: (872) 263-1100
    Facsimile: (872) 263-1109